## SONORA BANK & TRUST CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7838.    Promulgated May 25, 1927.

1. On the facts, *held* that alleged agencies of petitioner in Mexico were not, in fact, its agents, and that income received by such agencies was not thereby constructively received by petitioner.

2. Debts tentatively ascertained in one year by an officer of petitioner to be worthless, such action being finally approved by the board of directors and the debts charged off pursuant thereto in the following year, held to be a proper deduction from income for the latter year under section 234 (a) (5) of the Revenue Act of 1918.

*George M. Morris, Esq.*, for the petitioner.
*W. H. Lawder, Esq.*, for the respondent.

This is a proceeding for the redetermination of deficiencies in income and profits taxes for the calendar years 1919 and 1920 in the amounts of $1,706.30 and $10,377.91, respectively. Approximately the amount of $9,000 only is in dispute. The issues raised involve the correctness of the Commissioner's action (1) in adding to petitioner's income certain amounts representing profits alleged to have been received through agencies in Mexico; (2) in disallowing deductions claimed by petitioner for bad debts; and (3) in adding to petitioner's income amounts representing donations by the Mexican agencies.

### FINDINGS OF FACT.

Petitioner is a banking corporation, organized in 1914 under the laws of Arizona, with a capital of $100,000. Its principal office and place of business is at Nogales.

The Banco de Sonora was and is a Mexican corporation, which for many years prior to 1910, conducted a banking business in the Republic of Mexico. Its home office was at Hermosillo, Sonora, and it operated branches at various other places in the State of Sonora. It was the largest banking institution in the northwestern part of Mexico, having resources of approximately 15,000,000 pesos, or $7,500,000 American money. In 1910, the Madero revolution was started in Mexico, which brought about a condition of chaos and disrupted the banking business. Thereupon, the Banco de Sonora transferred all of its movable assets to the United States and in 1914 organized the petitioner, with a view to preserving and carrying on its former business as far as possible. Certain immovable assets, including its banking houses in Mexico, were left in charge of a representative at each place who had formerly been an employee of the corporation. All of petitioner's capital was contributed by the Banco de Sonora, and all of its stock was issued to and held in the names of the directors of the Mexican corporation. Because of the absence of adequate banking facilities in Mexico, former depositers and customers of the Banco de Sonora applied to its representatives in Mexico to accept deposits of money for them, to transfer money to the United States, to forward mail and to peform other acts pertaining to banking functions. At first the representatives or agents of the Banco de Sonora operated under their own individual names, but later, with a view of affording such agents further protection in the handling of their business, the directors of petitioner authorized them to use the title "*Agencia*, Sonora Bank & Trust Company, Nogales, Arizona." Petitioner did not contribute capital to any of the *agencias* or agencies, and made no contracts with them. The primary function of the *agencias* was to look after the business of the Banco de Sonora and to preserve its assets, but in connection with the performance of this function, they handled their business through petitioner's bank at Nogales. The *agencias* were soley responsible to their customers for deposits and petitioner assumed no responsibility until money was actually received by it. Petitioner paid no expenses in connection with the operation of the *agencias* and did not pay them any salary or other compensation. The *agencias* accepted deposits, made loans and transacted other business without any control or regulation by petitioner; they operated entirely independently of petitioner. Petitioner received no

income or profits arising from transactions between the *agencias* and their customers. It received income only on such business as it transacted directly with the depositors, which income was reported in its returns and is not in controversy here. Losses sustained by the *agencias* were not claimed by nor entered in the accounts of petitioner as such. Petitioner did not receive during 1919 or 1920 any cash or other property from any *agencia* other than for credit to the *agencia*, and during said years petitioner received no income earned by or through said *agencias*. Petitioner had no authority under the laws of Arizona to operate branches beyond the borders of the State and had no authority under the laws of Mexico to transact any banking business in that country. The State Banking Department of Arizona treated the *agencias* as correspondents of petitioner, and in its books of account petitioner recorded its transactions with the *agencias* in the same manner as those with its bank correspondents in the United States.

In December of each year, the secretary of petitioner, after consultation with other local officers and directors, would prepare a list of notes or obligations owing to petitioner, which had been determined by him in that year to be worthless. Prior to placing an obligation on such list, a thorough investigation was made through acquaintances, employees, or local banks, and any other available sources of information respecting the debtor's financial condition. In case any assets were found which could be subjected to payment of the obligation, the note would be turned over to an attorney with instructions to begin suit. If no assets could be found and petitioner had no collateral security or it had become worthless, or if the debtor was insolvent, or had left and his whereabouts were unknown, the obligation would be determined by the secretary to be worthless and would be placed on the list of bad debts. Such lists would be thereafter presented to the directors of petitioner at their next annual meeting, usually held about the middle of February of each year. The lists of bad debts so prepared would invariably be approved by the directors as a matter of form without alteration or amendment.

In December, 1918, the secretary of petitioner prepared a list of eight items aggregating the sum of $4,985.68, which he determined at that time to be worthless. At the annual meeting of the directors held in March, 1919, the list was approved and on March 21, 1919, the amount was charged off as bad debts as of December 31, 1918.

In December, 1920, the same officer of petitioner prepared a list of debts determined by him at that time to be worthless, consisting of fourteen items and aggregating the total sum of $10,263. This list was submitted to the directors at a meeting held on March 28,

1921, and was duly approved. Thereafter, on April 6, and April 9, 1921, the items were charged off the books as bad debts. These entries purported to be made as of December 31, 1920, and were made concurrently with the closing entries for that year.

OPINION.

TRAMMELL: Petitioner contends that, in the determination of the deficiencies involved herein, respondent erred (1) in adding to petitioner's income for the year 1919 the sum of $6,044.66 and for the year 1920, the sum of $17,672.63 representing profits or income received by or through agencies in Mexico; (2) in disallowing for the year 1919, a deduction for bad debts in the sum of $4,985.68, and for the year 1920, a deduction for bad debts in the sum of $10,263; and (3) in adding to petitioner's income for the year 1919 the sum of $500.60, and for the year 1920, the sum of $592.55, representing donations made by the Mexican *agencias*.

With respect to the first issue, it appears that respondent added to petitioner's income the amounts above mentioned, as profits of the Mexican *agencias*, on the theory "that the corporation had an enforceable right to the profits of the agencies which were being operated by agents and employees of the corporation and the profits made by them were income to the corporation as and when realized by the agencies, regardless of when such income was actually turned over." It also appears that the alleged profits in question were not shown by the books of the petitioner but were obtained from the report of a revenue agent.

It may well be that if the Mexican *agencias* were in fact the agents of petitioner and operated branch offices for it, any income received by such agents or branches would be income to petitioner, as asserted by the respondent. However, the evidence before us discloses an entirely different state of facts. It is shown that, during the years involved in this proceeding, the *agencias* were not in fact agents of petitioner but were no more than correspondents; that the English word "agents" is not an accurate or exact translation of the Spanish word "*agencias*"; that petitioner had no contracts with them nor any enforceable right to their profits; paid them no salaries or other compensation; did not bear or share their losses; received from them no money or other property except for credit to their accounts, and did not *in fact* receive any profits or income from or through them. The *agencias* were representatives of the Banco de Sonora and operated entirely independently of petitioner. On these facts, we are unable to agree with the contention of respondent that income received by the *agencias* was thereby constructively received

by petitioner. We must, therefore, hold that respondent erred in adding to petitioner's income for the year 1919 the amount of $6,044.66 and for the year 1920 the amount of $17,672.63 as profit or income from said *agencias*.

The second issue involves the correctness of respondent's action in disallowing deductions claimed by petitioner in its return for 1919 and 1920 on account of so-called bad debts. These deductions were claimed under section 234 (a) (5) of the Revenue Act of 1918 which reads as follows:

SEC. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*          \*          \*          \*          \*          \*          \*

(5) Debts ascertained to be worthless and charged off within the taxable year.

Prior to December 31, 1918, an officer of petitioner prepared a list of obligations owing to it, aggregating the total sum of $4,985.68, which he determined through investigation to be worthless at that time, and this list was submitted to the directors at a meeting held in March, 1919. The action of the officer in determining the debts to be worthless in December, 1918, was approved by the directors, and on March 21, 1919, the amount was charged off the books as bad debts. For the year 1920, substantially the same procedure was followed. The same officer prepared a list of obligations owing to petitioner, consisting of fourteen items aggregating the sum of $10,263, which he determined in December of that year to be worthless. The list was thereafter presented to the directors at a meeting held on March 28, 1921, and was formally approved. On April 6, 1921, twelve of the items were charged off the books as bad debts. Three days later, on April 9, the two remaining items were charged off as bad debts.

Petitioner claimed a deduction in its return for 1919 of the amount of the debts ascertained by its secretary to be worthless in December, 1918, but which was not finally determined to be worthless until the meeting of the directors in March, 1919, and which was thereafter charged off on March 21, 1919. Respondent disallowed the deduction for 1919 and allowed it for the year 1918. With respect to the obligations ascertained by the secretary to be worthless in December, 1920, but not finally determined by the directors to be worthless until March, 1921, and not charged off until in April, 1921, petitioner claimed a deduction in its return for 1920, which was disallowed by respondent. Petitioner now contends that it is entitled to have these deductions treated in the same manner, and that they should be allowed for the years 1918 and 1920, respectively, or that they should be allowed for the years 1919 and 1921, respectively. On the facts before us, we must agree with this contention.

The evidence shows that an officer of petitioner, who was in charge of collections and had general supervision over its accounts, tentatively ascertained the debts in question to be worthless in December, 1918, and in December, 1920, respectively. This officer testified at the hearing at length and in detail respecting the methods by which he ascertained the obligations to be worthless. Each item was carefully investigated and in each instance it was found that the debtor had become insolvent or had departed from the country and his whereabouts were unknown, leaving no property subject to execution. In some cases, the obligations also were secured by stock or other collateral, which had become entirely worthless.

From all the evidence before us, we are satisfied that the debts in question were in fact worthless, and that their elimination from petitioner's assets was an exercise of sound business judgment.

There is no dispute as to when and in what manner the debts were charged off. The only question respecting the deductions claimed for bad debts is whether or not the debts were ascertained by petitioner to be worthless within the taxable year in which they were so charged off. We are not convinced from the evidence that the secretary of petitioner was authorized to make a final ascertainment and charge off the debts tentatively determined by him to be worthless. This conclusion is supported by the fact that for each of the years involved, the matter was submitted to the board of directors for action. We must hold, therefore, that the debts aggregating the sum of $4,985.68 which were formally ascertained by the board of directors of petitioner in March, 1919, to be worthless, and which were charged off on March 21, 1919, constituted a proper deduction from petitioner's income for 1919, as claimed by it in its return for that year. The action of respondent in disallowing the deduction for 1919 is disapproved. Likewise, the debts aggregating the sum of $10,263, which were ascertained by the board of directors on March 28, 1921, to be worthless, and which were charged off the books on April 6, and April 9, 1921, constituted a proper deduction from petitioner's income for the year 1921. The action of respondent in disallowing the deduction of this amount as claimed for 1920, is approved.

With respect to the third and remaining issue involved herein, no evidence was offered at the hearing. Accordingly, the action of the respondent in that regard is sustained.

*Judgment will be entered on 15 days' notice, under Rule 50.*

MURDOCK dissents on the second point.